**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELA MARIE WOODHULL, | ) | CASE NO. 5:25-CV-879 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Angela Marie Woodhull's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). Ms. Woodhull seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated May 2, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

In March 2022, Ms. Woodhull applied to the Social Security Administration (SSA) seeking a period of disability, DIB, and SSI benefits; she claimed that she became disabled on April 20, 2020. (Tr. 220, 223.)[2] She identified thirteen allegedly disabling conditions: (1) "bipolar";

---

[1] Leland Dudek was serving as Acting Commissioner of Social Security when the complaint was filed. He served in that role until Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 40"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 808").

1

(2) "anxiety"; (3) chronic obstructive pulmonary disease; (4) fibromyalgia; (5) colitis; (6) schizophrenia; (7) post-traumatic stress disorder; (8) "paranoia"; (9) "trust issues"; (10) high cholesterol; (11) major depressive disorder with psychotic features; (12) mild agoraphobia; and (13) multiple personality disorder. (Tr. 251.)

The SSA denied Ms. Woodhull's application initially and upon reconsideration. (Tr. 82, 94, 95, 107.) Ms. Woodhull requested a hearing before an administrative law judge (ALJ). (Tr. 167.) The ALJ held a hearing on February 14, 2024, at which Ms. Woodhull was represented by counsel. (Tr. 46–81.) Ms. Woodhull testified, as did an independent vocational expert (VE). (*Id.*)

On March 15, 2024, the ALJ issued a written decision finding that Ms. Woodhull is not disabled. (Tr. 11–40.)

Ms. Woodhull requested review of the ALJ's decision. (Tr. 218–19.)

On March 5, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On May 2, 2025, Ms. Woodhull filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Woodhull asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ erred at Step Two of the sequential analysis when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.
>
> **Second Assignment of Error:** The ALJ erred when he applied the wrong standard of review when he mostly adopted the residual functional capacity of the prior administrative law judge.
>
> **Third Assignment of Error:** The ALJ erred when he failed to support his conclusions or discuss supportability and consistency when he evaluated the opinions of the reviewing and examining sources.

(Pl.'s Merit Br. at 8, 11, 16, ECF No. 9, PageID# 808, 811, 816.)

III.    **BACKGROUND**

A.      <u>**Previous Application for Social Security Benefits**</u>

Ms. Woodhull previously applied for SSI benefits on July 17, 2019, alleging disability beginning in March 2019. (Tr. 112.) An ALJ issued a written decision denying the application on December 24, 2020. (Tr. 109.) In that decision, the ALJ found that Ms. Woodhull had the following severe impairments: (1) fibromyalgia; (2) COPD; (3) asthma; (4) colitis; (5) bipolar disorder; (6) generalized anxiety disorder; (7) post-traumatic stress disorder; and (8) panic disorder. (Tr. 114.)

Nevertheless, the ALJ concluded that Ms. Woodhull had the residual functional capacity to perform light work with certain exertional, environmental, and non-exertional limitations. (Tr. 117.) Specifically, Ms. Woodhull could frequently lift and carry objects weighing up to 10 pounds and could occasionally lift and carry up to 20 pounds. (*Id.*) She could sit for six hours and stand or walk for six hours in an eight-hour workday. (*Id.*) She can never climb ladders, ropes, or scaffolds, but she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*)

The ALJ further found that Ms. Woodhull can tolerate occasional exposure to extreme temperatures, vibrations, fumes, odors, dust, gases, poorly ventilated areas, and hazards. (*Id.*)

Finally, the ALJ determined that Ms. Woodhull retains the capacity to understand, remember, and carry out simple instructions. (*Id.*) She can respond appropriately to occasional superficial social interactions, "defined as no teamwork or over the shoulder supervision," but should have no interaction with the general public. (*Id.*) Her work activity should not involve fast-paced production requirements and few, if any, work related decisions. (*Id.*) She can adjust to usual work situations and occasional changes in the routine work setting. (*Id.*)

Based on these and other findings, the ALJ determined that Ms. Woodhull was not disabled. (Tr. 122.) Ms. Woodhull sought review of that decision, but the SSA Appeals Council declined to reverse the decision. (Tr. 127.)

### B. Personal, Educational, and Vocational Experience

Ms. Woodhull was born in July 1973 and was 49 years old on the date of her application. (Tr. 48, 220.) She obtained her GED.[3] (Tr. 56, 252.) She has never held a driver's license and does not drive. (Tr. 55.) She at one time completed specialized training to be a state tested nursing assistant. (Tr. 252.) She has some experience working as a cashier, as a cook, and doing factory work. (Tr. 253, 312.) She last worked in 2019. (*Id.*) She lives with and cares for her ex-husband, who is disabled. (Tr. 54–55.)

### C. Function Report

Ms. Woodhull completed a function report on March 4, 2022. (Tr. 263–70.) She wrote that she has severe anxiety and PTSD, "trust issues," agoraphobia, and major depressive disorder. (Tr. 263.) She said that she cannot control her thoughts and "it comes out" as anger when she is around more than three or four people. (*Id.*) She "feel[s] like killing" if she is around too many people. (*Id.*) This has led to difficulty at work; whenever she has tried to work, she ends up quitting or being fired after treating customers in a way that is not allowed. (*Id.*)

On an average day, she gets dressed, drinks coffee, and then just "sit[s] and watch[es] the world out of a window." (Tr. 264.) She is able to care for her pets. (*Id.*) She has insomnia because her brain "won't shut off" when she tries to sleep. (*Id.*)

---

[3] The record contains numerous educational records. (Tr. 319–39, 345, 389–90.) While neither party directs the Court's attention to matters contained in these records, I note that I have reviewed them.

Ms. Woodhull wrote that she is physically able to get dressed, bathe, feed herself, and see to her own hygiene. (*Id.*) But when she is feeling depressed, she has no motivation to dress herself or do anything else for herself. (*Id.*) She is able to prepare meals, but she normally only prepares a quick evening meal that takes no longer than a half hour to prepare. (Tr. 265.)

Ms. Woodhull is physically able to perform household chores, but she finds that doing so takes her longer than usual because of her fibromyalgia pain and because she gets short of breath. (*Id.*) She usually spends one day a week performing chores, and it takes her all day. (*Id.*)

Ms. Woodhull shops once a month for groceries and toiletries. (Tr. 266.) She prefers not to leave her house at all. (*Id.*) She often has the television on, but she does not really watch it; she leaves it on "for noise." (Tr. 267.) She described that she spends most of her time in thought, dealing with her mother's voice in her head and her "past haunting [her]." (*Id.*)

Ms. Woodhull does not have friends or associate with her family. (*Id.*) She does not handle stress well, as she gets very angry, vocal, and sometimes physical under stress. (Tr. 269.) She believes everyone is "out to get [her]" and against her in one way or another. (*Id.*) She does not follow written instructions well, but she can follow verbal directions most of the time. (Tr. 268.) She is "ok" with authority figures for brief periods. (*Id.*) She can pay attention for up to an hour, "if [she is] lucky." (*Id.*) Ms. Woodhull was fired from a couple jobs because she mistreated customers. (*Id.*)

Ms. Woodhull cannot walk longer than 15 minutes without a break and cannot do more than 10 or 15 stairs without a break, because of her COPD. (*Id.*) After exertion, she needs to rest for about 15 minutes and use her inhaler. (*Id.*) She can lift objects for a short amount of time, up to an hour. (*Id.*) It takes her longer to complete tasks because her fibromyalgia causes her "so much pain at times" and because she has a hard time keeping her mind on track. (Tr. 270.)

5

In appealing the initial-level agency findings, Ms. Woodhull reported that her PTSD and anxiety symptoms had worsened. (Tr. 162; *see also* Tr. 289.) She said that she "[c]annot smell fire without seeing fire in her head" and "turns into a blubbering mess" whenever she sees a person with red hair.[4] (*Id.*) She reported that her agoraphobia had gotten worse, to the point that she becomes agitated and "feels like someone is standing on her chest" when she is not at home. (*Id.*) She said that these symptoms had worsened since her father passed away in January 2023. (*Id.*)

### D.    Relevant Hearing Testimony

#### 1.    *Ms. Woodhull's Testimony*

Ms. Woodhull testified that she has never held a driver's license. (Tr. 55.) If she sits behind the wheel of a car, she has severe panic attacks that make her feel like she is "dying." (*Id.*) She either walks, uses public transportation, or gets a ride with a friend or in a taxi when she needs to go somewhere. (Tr. 56.) She uses medical transportation to attend medical appointments. (*Id.*) She also arranges transportation for her husband when he has appointments. (*Id.*)

Ms. Woodhull testified that her parents both passed away within the last year. (Tr. 57.) Ms. Woodhull is having "severe flashbacks and PTSD problems" as a result of their deaths. (*Id.*) She is not sleeping much and finds herself "go[ing] blank" at points during the day, episodes that she referred to as "daytime flashbacks." (*Id.*) During these episodes, she does not realize what is going on around her. (*Id.*)

Ms. Woodhull said that she has issues being around other people. (*Id.*) She does not trust people, a fact that she attributes to past abuse. (Tr. 59.) She stays in her room "24 hours a day" except to use the restroom, eat, or go to a doctor's appointment. (Tr. 57.) Even then, her doctor's

---

[4] There had been a fire at her home, and her mother had red hair.

appointments are almost all over the phone or through videoconferencing software. (Tr. 57–58.) She does not go to restaurants, movie theaters, church, or any similar places. (Tr. 65.)

Ms. Woodhull left the house around two weeks before the hearing, to go to a medical appointment for dentures. (Tr. 60.) She then went out a few days later, for about an hour and a half, to pay her ex-husband's bills. (Tr. 60–61.) And she was leaving on the day of the hearing, to have her dentures adjusted. (*Id.*)

She described that going out to pay bills caused her to have significant anxiety because the places she went were full of people. (Tr. 62.) She had heart palpitations and "felt like everything was closing in" on her. (*Id.*) She said she is able to text with other people but cannot handle in-person interactions; she finds herself being "not very nice." (Tr. 63.) She said that every day, she prays "for the law to let me murder every stupid person in the world." (*Id.*) She finds that every time she goes to a store, she ends up in an altercation or argument—"cart rage," she calls it. (Tr. 64.) She has been asked to stop screaming in stores. (*Id.*)

Ms. Woodhull said that she had experienced these interpersonal issues since she was 18 years old, although it has "progressively gotten worse" over the last three years. (Tr. 65.)

Ms. Woodhull was forced to travel to Oregon around two months before her hearing; she flew out there and stayed for over a month, to see her daughter and her stepmother, who was dying. (Tr. 66.) Ms. Woodhull described the travel as the "worst days of [her] life," because it was "an entire month of dealing with strangers" that she did not trust. (*Id.*) She found herself staying inside, crocheting, until she was able to see her stepmother. (Tr. 68.)

Ms. Woodhull had been seeing a psychiatric nurse practitioner for about a year prior to November 2023. (Tr. 58.) In November 2023, the provider passed away unexpectedly, and Ms. Woodhull did not consult with a new provider until February 2024 (the day before the SSA

hearing). (*See id.*) When she was in treatment, she met with the provider over the phone between once a month and once every three months. (*Id.*) Ms. Woodhull takes lumateperone (Caplyta) and alprazolam (Xanax). (*Id.*)

Ms. Woodhull is also under the care of a primary care doctor, a pulmonologist, and a dentist. (Tr. 69.)

Ms. Woodhull testified that she has "tremors" and finds her head bobbing. (Tr. 66.) She finds herself out of breath from moving or talking. (Tr. 71.) After standing for five to 20 minutes, she has to sit down and rest because she is tired and hurting and her lungs feel "heavy." (*Id.*; *see also* Tr. 77.)) The pain is throughout her whole body but is worst in her arms, legs, and back. (Tr. 77.) If she walks for longer than 15 minutes, she has to sit down and rest for at least a half hour to catch her breath. (Tr. 73.) She takes a daily COPD medication twice a day and finds herself using her rescue inhaler several times a day. (Tr. 73.) Ms. Woodhull has restless legs syndrome, which makes it difficult to fall asleep because she has to "constantly be wiggling . . . and jiggling" her legs. (Tr. 75.) She is only able to sleep between two to four hours a night. (*Id.*) Then she naps throughout the day. (*Id.*)

Ms. Woodhull smokes tobacco cigarettes and uses medical marijuana daily. (Tr. 69.) She often has to go to the dispensary in person to pick up the medical marijuana, but sometimes she is able to have a neighbor or friend pick it up for her. (Tr. 69–70.)

On an average day, Ms. Woodhull wakes up around 11 a.m., takes her dog outside, makes a pot of coffee, and then sits in the chair in her room for about three hours. (Tr. 70.) She then takes her dog outside again before returning to her chair until around 6 p.m. (*Id.*) She then takes the dog outside a third time and feeds the dog and the cats before returning to her chair until around 8 p.m.

(*Id.*) At that time, she fixes dinner and eats in her chair, staying there until she falls asleep at around 4 a.m. (*Id.*)

Ms. Woodhull said she does not watch television or use her phone when she is sitting in her chair. (Tr. 71.) She finds herself sitting in silence, petting her dog, while her brain "is just going 20,000 miles a minute," especially since her parents passed away. (*Id.*) One day in the week before the hearing, she found herself curled up in her bed for the entire day, although this is not normal for her. (*Id.*) She said that all she has ever felt in her life is "sadness and hollowness and emptiness." (Tr. 74.) She finds herself crying frequently, most often when she is having a flashback. (*Id.*)

Ms. Woodhull sets up her ex-husband's medical appointments, reminds him to take his medications, and makes him dinner. (Tr. 72.)

### 2.    *Vocational Expert's Testimony*

Lynn Smith testified as a vocational expert (VE) at the hearing. (Tr. 78.) The ALJ asked the VE to assume that a hypothetical individual with Ms. Woodhull's age and education was limited to light work with additional limitations. (Tr. 79.) Specifically, the individual could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds. (*Id.*) The individual could occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) They could frequently be exposed to dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat. (*Id.*) They would be limited to simple, routine, and repetitive tasks outside of a production rate pace. (*Id.*) They could handle only simple work-related decisions, occasional interaction with supervisors and coworkers, and few changes in a routine work setting. (*Id.*) They must never interact with the public. (*Id.*)

The VE testified that such a person could perform the work of a mail clerk (DOT 209.687-026), laundry worker (DOT 302.685-010), or price marker (DOT 209.587-034).

The ALJ next asked to VE to assume that the hypothetical individual would also have to work alone. (Tr. 80.) The VE testified that no work would be available to someone so limited. (*Id.*)

The VE confirmed that an employer will tolerate an employee who is off task for up to 10 percent of the time, but no more than that. (*Id.*) Employers will tolerate one absence per month. (*Id.*)

### E.      **State Agency Consultants**

A disability examiner (Maria Patterson), a physician (Venkatachala Sreenivas, M.D.), and a psychologist (Aracelis Rivera, Psy.D.) reviewed Ms. Woodhull's claim at the initial review level. (Tr. 82–94.)

Dr. Rivera opined that Ms. Woodhull had moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule while maintaining regular attendance, sustain an ordinary routine, work in coordination with or in proximity to others, and complete a normal workday and work week without interruptions or unreasonable breaks. (Tr. 91.) Dr. Rivera reasoned that Ms. Woodhull was distractible and fatigued at the consulting evaluation but remained capable of engaging in tasks that can be performed alone, if the work does not require a fast pace or more than basic decision-making. (*Id.*)

Dr. Rivera noted several moderate limitations in Ms. Woodhull's ability to engage in social interaction. (Tr. 92.) The doctor opined that Ms. Woodhull remained capable of brief, superficial interaction with coworkers and supervisors but should have no interaction with the general public. (*Id.*)

Dr. Rivera also noted moderate limitations in Ms. Woodhull's ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (*Id.*) Dr. Rivera opined that Ms. Woodhull remained capable of performing routine tasks

in an environment where she can work alone and where changes can be explained and implemented over time. (*Id.*)

Dr. Sreenivas adopted the physical residual functional capacity from Ms. Woodhull's previous application for SSI based on SSA's Acquiescence Ruling 98-4(6); the doctor reasoned that the evidence did show a history of COPD and fibromyalgia "but that her physical exams are normal." Tr. 88, 90–91; *see also* Acquiescence Ruling 98-4(6), 63 Fed. Reg. 29,771, 1998 WL 274052 (June 1, 1998).[5]

The agency consultants determined that Ms. Woodhull retained the ability to perform certain light work, such as that required of a "poultry dresser" (DOT 525.687-070), "marker II" (DOT 920.687-126), or "cutter, hand II" (DOT 781.687-026). (Tr. 93.) They therefore found that she was not disabled. (Tr. 94.)

In a letter to Ms. Woodhull explaining its decision, the Agency wrote that she should avoid heavy lifting and constant exposure to extreme temperature and fumes but retained "sufficient strength, mobility, and lung function to perform many light duty tasks." (Tr. 144.) The Agency further wrote that Ms. Woodhull should avoid tasks that require constant attention to detail, working with the general public, or frequent changes in duties, but that she would be able to perform routine tasks and adjust to occasional changes. (*Id.*)

A disability examiner (Caitlyn Britel), physician (Dorothy Leong, M.D.), and psychologist (Michelle Hoy-Watkins, Psy.D.) reviewed Ms. Woodhull's claim at the reconsideration level. (Tr. 95–108.)

---

[5] The Agency would go on to rescind Acquiescence Ruling 98-4(6) on December 2, 2024, replacing it with Acquiescence Ruling 24-1(6). *See* Acquiescence Ruling 24-1(6), 89 Fed. Reg. 92922-02, 2024 WL 4870750 (Nov. 25, 2024).

Dr. Hoy-Watkins concluded that there was no new or material evidence to indicate a material change in Ms. Woodhull's mental status after the initial review. (Tr. 101.) Dr. Hoy-Watkins found the initial findings to be consistent and supported by the record evidence. (*Id.*) She opined that Ms. Woodhull's mental impairments were severe but that they did not meet or equal a listing. (*Id.*)

Dr. Leong similarly concluded that there had been no material change in Ms. Woodhull's level of functioning and that the initial level findings were supported and consistent with the record. (Tr. 104.)

The agency consultants determined that Ms. Woodhull retained the ability to perform certain light work, such as that required of an "addresser" (DOT 209.587-010), "mill stenciler" (DOT 659.685-026), or "dial marker (electrical equipment)" (DOT 729.684-018). (Tr. 107.) They therefore affirmed that she was not disabled. (*Id.*)

In a letter to Ms. Woodhull explaining this decision, the Agency wrote that despite the pain and discomfort she experiences, she is able to move about and use her arms, legs, hands, and back to perform some limited types of activities. (Tr. 165.) The Agency further wrote that Ms. Woodhull retained the ability to concentrate, relate to others, and perform daily activities, including work activities. (*Id.*)

### F. <u>Relevant Medical Evidence</u>

Ms. Woodhull was living in West Virginia in 2019.

Ms. Woodhull consulted with Andria Allen, D.O., on September 25, 2019. (Tr. 373.) Ms. Woodhull stated that she had been prescribed cholesterol medicine but never started taking that medicine. (*Id.*) She reported "some episodes of depression" and requested a referral to a psychiatrist to consider restarting mental health medication. (*Id.*) She said that she felt that her COPD was "at baseline" and refused to consider trying to quit smoking. (*Id.*) On examination, Dr.

Allen noted symptoms of depression but did not find signs of anxiety or high irritability. (Tr. 374.) Ms. Woodhull did not appear to be in any physical discomfort, and her gait and stance were normal. (*Id.*) Dr. Allen referred Ms. Woodhull to a psychiatry practice in Spencer, West Virginia. (*Id.*)

Ms. Woodhull followed up with Dr. Allen on December 18, 2019. (Tr. 370.) Ms. Woodhull requested a referral to a psychiatrist in a different part of West Virginia—Charleston. (*Id.*) Dr. Allen noted that Ms. Woodhull "refuses to take any psych meds" because she had previously been on medication and "did not like the way they made her feel." (*Id.*) Ms. Woodhull reported that she hears voices all the time; they "never go away." (*Id.*) Sometimes the voice is her own, and sometimes it is her mother's. (*Id.*) She admitted having suicidal thoughts and said she cried "all the time" at home but was able to control the tearfulness in public. (*Id.*)

Ms. Woodhull reported high irritability, emotional lability, and depression at the appointment. (Tr. 371.) But on examination, Dr. Allen noted no high irritability, depression, or anxiety. (*Id.*) Ms. Woodhull ambulated to the appointment independently, presented with a normal gait and stance, and did not report feeling poorly. (*Id.*) Dr. Allen noted a historical diagnosis of hyperlipidemia. (Tr. 370.) The doctor put in a referral to a psychological practice in Charleston. (Tr. 371.)

Four months later, on April 1, 2020, Ms. Woodhull presented for a clinical interview and mental status examination with that practice. (Tr. 349.) On examination, Ms. Woodhull presented with a depressed mood and a restricted affect. (Tr. 351.) The psychologist noted that Ms. Woodhull "indicated some auditory hallucinations" and had "suspicious thinking." (*Id.*) But Ms. Woodhull was friendly and cooperative during the evaluation, her social functioning appeared to be within normal limits, and she spoke at a normal rate. (*Id.*) Her memory, concentration, attention, psychomotor behavior, persistence, and pace were all normal. (*Id.*)

13

The psychologist opined that Ms. Woodhull appeared to meet the diagnoses for generalized anxiety disorder, agoraphobia, PTSD, borderline personality disorder, and recurrent major depressive disorder with psychotic features. (Tr. 351.) The psychologist explained that Ms. Woodhull appeared to suffer from recurrent major depressive episodes with intervals of time in which her mood was relatively normal. (*Id.*) She was experiencing excessive anxiety and worry about a number of issues, including a marked fear of being in open spaces and crowds. (Tr. 352.) The psychologist recommended individual therapy and the consideration of medication treatment. (*Id.*)

Ms. Woodhull had a wellness examination with Dr. Allen on May 27, 2020. (Tr. 365.) Ms. Woodhull reported that the Charleston clinic does not prescribe medication; she said she was willing to try an antidepressant medication and requested a medication to treat "restless legs." (*Id.*) She denied feeling poorly and complained of no physical pain or discomfort. (Tr. 366.) A physical examination was normal. (Tr. 366–67.) Dr. Allen prescribed an antidepressant and ordered bloodwork to assess Ms. Woodhull's cholesterol. (Tr. 367.) She also prescribed ropinirole to treat restless legs syndrome. (Tr. 368.)

Ms. Woodhull began attending counseling, and she followed up with Dr. Allen on July 27, 2020. (Tr. 362.) Ms. Woodhull reported that her counselor was pleased to see improvement since she started on medication, but Ms. Woodhull said she "cannot see any difference herself." (*Id.*) Her counselor recommended increasing the dosage. (*Id.*) Ms. Woodhull said the restless legs symptoms had resolved on medication. (*Id.*) A physical examination was normal, and Ms. Woodhull did not complain of any physical pain or discomfort. (Tr. 363.) Her mental status was normal, and Dr. Allen specifically noted that Ms. Woodhull's thought processes were "sequential

14

and coherent" and that she had a euthymic affect and was calmer "and less angry than at previous visits." (*Id.*) Dr. Allen increased the dosage of the antidepressant medication. (Tr. 363–64.)

Ms. Woodhull followed up with Dr. Allen on October 21, 2020. (Tr. 359.) Her medication was effective: her counselor noted continued mood improvement, and her restless legs symptoms remained controlled. (*Id.*) Ms. Woodhull reported "general body aches," which she rated as an eight on a scale of one to ten, but she said that she had been "more tense" recently leading up to a disability hearing. (*Id.*) She also endorsed diarrhea. (*Id.*) A physical examination was largely normal, except that Ms. Woodhull was "fidgeting"; she "appear[ed] well" overall. (Tr. 360.)

It seems that Ms. Woodhull did not follow up with a medical provider again for nearly two years. (*See* Tr. 432 ("Last seen: 2 years ago")). In that time, she moved from West Virginia to Ohio. (*See id.*)

Ms. Woodhull consulted with Terri Brooks, an advanced practice registered nurse and clinical nurse specialist, for a wellness visit on April 8, 2022. (Tr. 432.) Ms. Woodhull reported that she had COPD but said she did not get short of breath or experience wheezing with activity. (*Id.*) With respect to her mental health symptoms, Ms. Woodhull reported that she had been seeing a counselor "but quit going there" because she "had difficulties." (*Id.*) When discussing her symptoms, Ms. Woodhull reported that she was short of breath and wheezing and endorsed tremors. (*Id.*)

Ms. Brooks noted that Ms. Woodhull had a dysphoric mood and was anxious. (*Id.*) A physical examination was largely normal, including that Ms. Woodhull had normal breath sounds, although Ms. Brooks noted a head tremor. (Tr. 433.) Ms. Brooks noted diagnoses from 2015 that included bipolar I disorder, mild COPD, depression, fibromyalgia, hypoglycemia, PTSD, and schizoaffective disorder. (Tr. 434; *see also* Tr. 436 (identifying diagnoses treated in 2015–16)). Ms.

Brooks made medication changes, ordered blood tests, and referred Ms. Woodhull for consultation at a behavioral health clinic. (Tr. 434–35.)

When the lab work came back, Ms. Woodhull's cholesterol was "significantly elevated." (Tr. 430.) Ms. Woodhull reported that she had not been taking her cholesterol medication for "quite some time" but said that she would resume taking the medication. (Tr. 431.)

Ms. Woodhull consulted with Char Kicos, a board certified psychiatric mental health nurse practitioner, on April 25, 2022. (Tr. 562.) Ms. Woodhull reported that she had depression symptoms on more than half of the days in the last two weeks. (Tr. 571.) She denied difficulty concentrating, forgetfulness, or nervousness. (Tr. 564.) She endorsed mood lability, bothersome and fluctuating anxiety and depression, and insomnia. (*Id.*) She reported that she was having panic attacks "often." (Tr. 562.) She described times of irritability, tearfulness, and low motivation. (Tr. 563.) But she said that she was able to attend to her activities of daily living on most days "with ease." (*Id.*) She said she had racing thoughts "some of the time some days." (*Id.*)

On physical examination, Ms. Woodhull appeared to be in no acute distress, made good eye contact, and had a normal gait and station. (Tr. 565.) Ms. Kicos noted that Ms. Woodhull was in good overall physical health, with no particular physical complaints noted. (Tr. 563.) On mental examination, Ms. Woodhull appeared stable with normal mood. (*Id.*) Ms. Kicos noted no psychotic features. (*Id.*) Ms. Woodhull was cooperative with fair affect, neutral mood, normal thought processes, and appropriate concentration. (*Id.*) She was visibly anxious. (Tr. 562.)

Ms. Kicos's diagnostic impression was that Ms. Woodhull had "bipolar panic and PTSD." (Tr. 563.) Ms. Kicos identified Ms. Woodhull's PTSD symptoms as "startle and poor sleep and trust issues" that were "severe." (*Id.*) Ms. Kicos wrote that Ms. Woodhull has panic attacks

16

sometimes daily which are severe and characterized by symptoms like palpitations, sweating, trembling, fear of losing control, and a sense of detachment. (Tr. 563–64.)

Ms. Kicos started Ms. Woodhull on a trial of lumateperone and a dosage of alprazolam, in addition to her current antidepressant. (Tr. 565.) Ms. Woodhull was encouraged to engage in therapy. (Tr. 566.)

Ms. Woodhull followed up with Ms. Kicos on May 23, 2022. (Tr. 747.) Ms. Kicos noted that Ms. Woodhull's mood lability had been "well managed with medications." (*Id.*) Ms. Woodhull reported that her mood was more stable and her depression was lower. (*Id.*) She said that she had run out of alprazolam, causing her anxiety symptoms to increase. (*Id.*) She asked for a higher dose. (*Id.*) She said she was still having poor sleep most nights. (*Id.*)

On examination, Ms. Woodhull was "friendly, pleasant, cooperative, and attentive." (*Id.*) She appeared "relaxed." (*Id.*) Her physical and mental statuses were normal. (Tr. 749.) Ms. Kicos continued Ms. Woodhull on her medication, increasing the dosage of alprazolam and adding daridorexant. (Tr. 750.)

Ms. Woodhull underwent a mental disability evaluation with Carolyn Arnold, Psy.D., on May 24, 2022. (Tr. 412.) Ms. Woodhull described that she feels very angry, a feeling that becomes "murderous rage" when in public. (Tr. 413.) She complained of nervousness, tremors, sweating, stuttering, mood variability, frequent tearfulness, nightmares, sleeplessness, and hearing her mother's voice in her head constantly. (*Id.*) She said that counseling had not been helpful but acknowledged that medication was "sometimes helpful." (*Id.*) She described that she was previously fired from a job for "raging at a customer." (Tr. 414.)

On examination, Ms. Woodhull's affect was congruent with her stated angry, sad, and fearful mood. (*Id.*) But she was cooperative and exhibited no psychomotor agitation. (*Id.*) She

reported thoughts of suicide and hurting others but said she would not follow through on those thoughts. (*Id.*) She did not have hallucinations. (*Id.*)

Dr. Arnold found that Ms. Woodhull met the diagnostic criteria for schizoaffective disorder, bipolar disorder, and PTSD. (Tr. 416.) Dr. Arnold opined that Ms. Woodhull can understand, remember and carry out instructions, follow a conversation, think abstractly, and apply reason. (Tr. 416.) Ms. Woodhull's short-term memory was intact, her long-term memory was largely intact, and her mental flexibility was intact. (*Id.*) Although she is distractible and fatigued, she is able to sustain concentration and show persistence with simple tasks for a moderate period of time, and with multistep tasks for a short period of time. (*Id.*) Dr. Arnold reported that Ms. Woodhull is able to do most household tasks but cannot go shopping because of her agoraphobia and her rage. (Tr. 415.)

Ms. Woodhull followed up with Ms. Brooks on June 21, 2022. (Tr. 423.) Ms. Woodhull reported that her current psychiatric treatment was "going well." (Tr. 424.) Her COPD was identified as moderate and stable. (Tr. 423–24.) Her physical examination was normal, including normal breath sounds and pulmonary effort and normal bowel sounds. (Tr. 425.)

Ms. Woodhull met with Ms. Kicos on July 18, 2022. (Tr. 577.) She presented to the appointment happy, but she reported that she was struggling with self-care and keeping calm. (*Id.*) She said she still had "some times" of tearfulness. (*Id.*) She reported less panic overall, although she still suffered from symptoms of panic, fear, uneasiness, and trouble sleeping. (Tr. 578.) Her physical and mental-status examinations were largely normal. (Tr. 579.)

Ms. Woodhull underwent a medical disability consulting evaluation with Subhan Ahmad, M.D., on August 2, 2022. (Tr. 452–56.) She reported that she "hurts all over all of the time" due to fibromyalgia, but she admitted that she had never seen a rheumatologist or any other specialist for

18

this condition. (Tr. 453.) She takes ibuprofen when needed for pain. (*Id.*) She said that she could sit and stand for an unlimited period of time but has pain with walking long distances. (*Id.*)

Ms. Woodhull further reported that she has diarrhea every day and was diagnosed with colitis around 30 years ago. (Tr. 453.) But she said she has never seen a gastroenterologist for the condition and is not willing to consult with a specialist or obtain a colonoscopy to better understand the extent of the condition. (*Id.*)

On physical examination, Ms. Woodhull presented as well appearing and was in no acute distress (Tr. 454). Her lungs were clear without wheezing. (*Id.*) She was able to walk on her heels and toes and perform tandem gait; her gait was normal without any assistive device. (Tr. 454–55.) There was no tenderness to palpation of the spine, and her range of motion, sensation, and muscle strength were intact in all four extremities. (Tr. 455.)

After the examination, Dr. Ahmad opined that Ms. Woodhull's psychiatric conditions are "the most disabling factor in her life." (*Id.*) He recommended that Ms. Woodhull undergo a formal mental health evaluation. (*Id.*) With respect to COPD, Dr. Ahmad noted that Ms. Woodhull had normal spirometry but exhibited "some mild functional limitations" from breathing issues; he recommended that she consult with a pulmonologist to better delineate these limitations and optimize treatment. (*Id.*) Dr. Ahmad opined that Ms. Woodhull's hyperlipidemia, colitis, and fibromyalgia were chronic and stable conditions for which no "red flag signs" appeared on examination. (Tr. 456.)

Ms. Woodhull met with Ms. Kicos on August 30, 2022. (Tr. 737.) She appeared tearful and sad at the appointment, describing recent significant stressful events affecting members of her family. (*Id.*) She complained of increased anxiety that could not be adequately controlled with the alprazolam or with marijuana. (*Id.*) She said she had experienced many panic attacks recently.

(Tr. 738.) Her physical and mental examination were unremarkable. (Tr. 739–40.) Ms. Kicos continued Ms. Woodhull on her current medication schedule and provided supportive psychotherapy regarding the described stressors. (Tr. 740.)

Ms. Woodhull presented as upset, irritable, and yelling at her next appointment with Ms. Kicos, on September 28, 2022. (Tr. 732.) She described stressors, including her living situation and food and money insecurity. (*Id.*) Physical and mental examinations remained unremarkable. (Tr. 734–35.) Ms. Kicos again continued Ms. Woodhull on her current medication schedule and provided supportive psychotherapy regarding the described stressors. (Tr. 735.)

Ms. Woodhull consulted with Elizabeth Brown, M.D., a pulmonologist, on October 10, 2022. (Tr. 472.) Dr. Brown noted that Ms. Woodhull had last seen a pulmonologist in 2018 and had not obtained the recommended laboratory testing or otherwise followed up since then. (*Id.*) Pulmonary function testing at this appointment showed mild obstruction, with improvement in the small airways after using a bronchodilator. (*Id.*; *see also* Tr. 491.)

On examination, Ms. Woodhull was noted to have edema and clubbed digits in the extremities and diminished breath sounds (without wheezes or crackles). (Tr. 475.) The examination was otherwise materially normal. (*Id.*)

Dr. Brown changed Ms. Woodhull's COPD medication to Breztri, with continued use of albuterol as needed. (Tr. 475.) The doctor ordered an echocardiogram and allergy testing, noting both that the examination was concerning for pulmonary hypertension and that Ms. Woodhull's symptoms may have an allergic component. (Tr. 474–75.) She counseled Ms. Woodhull on the "paramount" importance of smoking cessation. (*Id.*) Ultimately, the echocardiogram indicated a cardiac murmur but showed no evidence of diastolic dysfunction or pulmonary hypertension. (Tr. 470–71.)

20

Ms. Woodhull followed up with a certified physician assistant on November 21, 2022. (Tr. 467.) She complained that she generally felt ill, citing postnasal drip and fibromyalgia pain. (Tr. 469.) She said she was using her albuterol more than four times a day, with some relief, but said she frequently experienced wheezing. (Tr. 467.) On physical examination, there was no edema or clubbing noted in the extremities; mental status was normal; and breath sounds did not include stridor, wheezes, or crackles. (Tr. 469–70.)

Ms. Woodhull consulted with Ms. Kicos on November 22, 2022. (Tr. 727.) She presented as upset and anxious, describing stressors involving her housing and financial insecurity. (*Id.*) Ms. Woodhull asked for more and higher-dosage alprazolam. (*Id.*) Ms. Woodhull described that she was taking the alprazolam "as she feels she should," leading Ms. Kicos to "encourage[] compliance" with her prescription regimen. (*Id.*) Her physical and mental status examinations were unchanged. (Tr. 729–30.)

Ms. Woodhull consulted with Liza Talampas, M.D., to establish a primary care relationship on December 12, 2022. (Tr. 502.) Ms. Woodhull said she was taking ibuprofen three times a day "for arthritis and fibromyalgia." (*Id.*) A physical examination was normal, except that there was wheezing present (but good air movement). (Tr. 504–05.) Dr. Talampas changed Ms. Woodhull's cholesterol medicine and encouraged efforts to improve diet, engage in regular exercise, and improve sleep. (Tr. 506.)

Ms. Woodhull met with Ms. Kicos in a telehealth appointment on January 26, 2023. (Tr. 716.) She presented as angry and yelling; it was difficult for Ms. Kicos to "get a word in edgewise." (*Id.*) Ms. Woodhull described stressors including her father's death and a falling out with a friend. (*Id.*) She said her depression was high, such that she is not able to function. (Tr. 717.)

Ms. Kicos continued Ms. Woodhull on her medication and provided supportive psychotherapy. (Tr. 719–20.)

Ms. Woodhull next met with Ms. Kicos, again in a telehealth format, on April 20, 2023. (Tr. 705.) Ms. Woodhull described that she was struggling to leave her home and had difficulty being around people and communicating with others. (*Id.*) She described her depression and anxiety as debilitating and said she is not functioning. (*Id.*) Ms. Kicos increased the dosage of alprazolam and provided supportive psychotherapy. (Tr. 708.)

Ms. Woodhull followed up with Dr. Brown on June 8, 2023. (Tr. 639.) Ms. Woodhull denied significant cough, wheezing, chest pain, or shortness of breath. (*Id.*) She had not needed her albuterol inhaler. (*Id.*) But she reported that she was fatigued and sleeping a lot, and she seemed "depressed" after the recent death of her father. (*Id.*) On examination, there was mild clubbing noted in the extremities. (Tr. 641.)

Ms. Woodhull met with a nurse practitioner at her primary-care practice on June 12, 2023. (Tr. 635.) She was "overall stable" but complained of worsening anxiety stemming from the recent deaths of family members. (*Id.*) On examination, she was alert, oriented, and in no acute distress. (Tr. 637.) She exhibited normal, cooperative behavior; normal attention and perception; normal mood, affect, and speech; and normal cognition, memory, and judgment. (*Id.*) Ms. Woodhull said that she had not completed the lab work that had been ordered at her last appointment. (Tr. 635.)

Ms. Woodhull consulted with Ms. Kicos on July 17, 2023. (Tr. 694.) Ms. Woodhull said that she had not been able to leave her home and was having trouble with her activities of daily living. (*Id.*) She said she recently "blew up" at her primary care provider. (*Id.*)

Ms. Woodhull next met with Ms. Kicos on October 23, 2023. (Tr. 683.) Ms. Woodhull said that she spends most of her days crying, but she reported that she had made progress getting out

22

of the house more often. (*Id.*) She had been to dentist and doctor appointments. (*Id.*) She was trying to eat healthier. (*Id.*) Ms. Kicos noted that Ms. Woodhull presented as friendly, pleasant, cooperative, and attentive. (*Id.*) Ms. Woodhull was compliant with her medication, "with favorable results." (Tr. 684.)

Unfortunately, Ms. Kicos passed away sometime after this appointment, after which Ms. Woodhull sought to transfer her care to another provider. (Tr. 664–65.)

Ms. Woodhull underwent a psychiatric evaluation with a new provider on February 13, 2024. (Tr. 765.) She said that she was happy with her current medication regimen, which had been effective at decreasing her "rage." (*Id.*) She complained that she was in chronic pain from fibromyalgia, had frequent flashbacks, and does not go outside often because she does not like to be around people. (*Id.*) Her mental status examination was generally normal. (Tr. 766–67.) Her diagnoses were listed as bipolar disorder, PTSD, and panic disorder. (Tr. 767.)

## IV.  THE ALJ'S DECISION

The ALJ determined that Ms. Woodhull has not engaged in substantial gainful activity since February 23, 2022, the application date. (Tr. 17.)

The ALJ next determined that Ms. Woodhull had the following severe impairments: (1) overlapping asthma and chronic obstructive pulmonary disease; (2) obesity; (3) schizoaffective disorder; (4) bipolar disorder; (5) anxiety disorder; and (6) posttraumatic stress disorder. (Tr. 17.)

The ALJ determined that none of Ms. Woodhull's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20.)

The ALJ determined that Ms. Woodhull had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 25.) Specifically, Ms. Woodhull can never climb ladders, ropes, or scaffolds, and she can only occasionally climb ramps and stairs.

(*Id.*) She can occasionally balance, stoop, kneel, crouch, or crawl. (*Id.*) She can have no more than frequent exposure to dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat. (*Id.*) She is able to have occasional interactions with supervisors and coworkers, but she cannot interact at all with the public and is only able to tolerate few changes in a routine work setting. (*Id.*)

The ALJ found that Ms. Woodhull had no past relevant work. (Tr. 38.) He found that Ms. Woodhull had at least a high school education. (Tr. 39.)

The ALJ then determined that—considering Ms. Woodhull's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as a "mail clerk" (DOT 209.687-026), "laundry worker" (DOT 302.685-010), or "price marker" (DOT 209.587-034). (Tr. 39–40.) Accordingly, the ALJ determined that Ms. Woodhull is not disabled. (Tr. 40.)

## V. LAW & ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.**     **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or

mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially

when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.   <u>Analysis</u>

#### *1.   First Assignment of Error—Step Two and SSR 96-8p*

In her first assignment of error, Ms. Woodhull argues that the ALJ erred beginning at Step Two of the sequential analysis and continuing through the development of the RFC, by failing to acknowledge the severity of Ms. Woodhull's fibromyalgia, colitis, hyperlipidemia, restless legs syndrome, and occasional resting tremor, and by failing to account for functional limitations stemming from those conditions when crafting the RFC.

Before addressing the heart of this assignment of error, I address two preliminary matters.

First, while Ms. Woodhull's assignment of error is framed around the ALJ's analysis at Step Two, any error at that step would be harmless here.

At Step Two, an ALJ must determine whether a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988)).

27

Ms. Woodhull argues that "failing to consider fibromyalgia as a severe impairment[] necessitates a remand of this matter." (Pl.'s Merits Br. at 10, ECF No. 9, PageID# 810.) She also claims reversible error from the ALJ's finding that her colitis, restless legs syndrome, and resting head tremor were not severe. (Pl.'s Reply Br. at 1, ECF No. 13, PageID# 841.) But when an ALJ finds severe and non-severe impairments at Step Two and continues through the subsequent steps in the sequential evaluation—as was the case here—any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Floyd v. Comm'r of Soc. Sec.*, No. 23-2036, 2024 WL 3103757, at *2 (6th Cir. June 24, 2024).

Second, while the parties both refer to colitis as a medically determinable impairment, the ALJ actually determined that colitis was not a medically determinable impairment. (Tr. 18 ("[T]here is no objective medical evidence to substantiate colitis as a medically determinable impairment . . . .")). Ms. Woodhull does not contend, let alone develop any meaningful argument, that the ALJ erred in coming to this conclusion. Therefore, the issue is waived. *See Sharpe v. Comm'r of Soc. Sec.*, No. 1:20 CV 2732, 2022 WL 2127960, at *4 (N.D. Ohio June 14, 2022) (quoting *Bard v. Brown Cty.*, 970 F.3d 738, 750 (6th Cir. 2020)) ("It is well-settled . . . that '[i]ssues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.'"). Even if it were not waived, Ms. Woodhull does not identify a functional limitation stemming from colitis that is inconsistent with the RFC—let alone direct the Court to a single medical opinion stating a functional limitation influenced by colitis. For these reasons, I need not consider Ms. Woodhull's argument regarding colitis any further. *See Parrish v. Berryhill*, No. 1:16-cv-1880, 2017 WL 2728394, at *8 (N.D. Ohio June 8, 2017) ("Plaintiff's brief also does not identify a single opinion from a treating, acceptable medical source concerning Plaintiff's functional limitations that is inconsistent with the RFC or the State agency opinions."); *Turkovich*

28

*v. Comm'r of Soc. Sec.*, No. 1:12 CV 01633, 2014 WL 29039, at *8 (N.D. Ohio Jan. 2, 2014) ("While Plaintiff suggests the need for additional workday breaks, she points to no medical source . . . prescribing this requirement or any other limitations not already included in the hypothetical.").

Having addressed these preliminary issues, I turn to the thrust of Ms. Woodhull's argument—she does not believe that the ALJ considered her non-severe impairments when crafting the RFC. She supports this argument first by pointing out that the ALJ did not specifically discuss her non-severe impairments at Step Three. (Pl.'s Merits Br. at 9–10, ECF No. 9, PageID# 809–10.) She then argues that the ALJ failed to consider any effects related to those conditions when explaining how he developed the RFC. (*Id.*)

Once one severe impairment is found, an ALJ must consider the combined effect of all the claimant's impairments—both severe and non-severe—when crafting the claimant's RFC. 20 C.F.R. § 404.1545(a)(2); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

Indeed, Social Security Ruling 96-8p recognizes that, "[w]hile a 'not severe' impairment[] standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

This standard recognizes that "'the definition [of a non-severe impairment] contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities.'" *Patterson v. Colvin*, No. 5:14-cv-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-cv-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015) (emphasis in original)).

On the other hand, though, finding a medically determinable impairment—even a severe one—does not automatically mean that a claimant has resulting functional limitations affecting

their ability to work. *See, e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work.").

Here, Ms. Woodhull is correct that the ALJ did not specifically address her fibromyalgia, hyperlipidemia, restless legs syndrome, or occasional resting tremor when making his Step Three findings. (Tr. 20–25.) He did not specifically address these non-severe impairments when formulating the RFC either, although he did acknowledge testimony relevant to those conditions:

> The claimant also testified that she gets "a little" out of breath when talking, feels her lungs get heavy, gets out of breath and must sit and rest after walking 15 minutes, and even when not doing so must administer her rescue inhaler four to six times per day, in addition to using a twice-daily inhaler as prescribed. Ms. Woodhull also testified that her head bobs, that she has RLS particularly at night such that her legs will not sit still, and that she cannot stand for longer than 15 minutes due to fibromyalgia pain, throughout her body but worse in her legs and arms.

(Tr. 26.)

Ms. Woodhull argues that the lack of specific discussion of the conditions after Step Two amounts to reversible error. The Commissioner defends the ALJ's decision, arguing that the ALJ adequately explained why he found no functional limitations from these conditions at Step Two and did not need to repeat that analysis at Step Three or later in the decision. The Commissioner also contends that the ALJ's conclusions in this regard were supported by substantial evidence, pointing out that Ms. Woodhull has not identified any specific functional limitations attributable to these impairments.

After careful consideration, I agree with the Commissioner.

In *Emard v. Commissioner of Social Security*, 953 F.3d 844 (6th Cir. 2020), the Sixth Circuit clarified an ALJ's obligations under SSR 96-8p with respect to non-severe impairments. The court noted that "[d]istrict courts in this circuit have held that an ALJ need not specifically

discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p." *Id.* at 851–52. The court agreed with those cases, holding that the ALJ's "express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [the claimant's] nonsevere impairments at step two of the analysis" meant that the ALJ complied with SSR 96-8p even though the ALJ failed to specifically discuss the claimant's non-severe impairments when formulating the RFC. *Id.* at 852.

That is the situation here.

The ALJ cited SSR 96-8p while summarizing the applicable legal standards, noting that he "must consider all of the claimant's impairments, including impairments that are not severe." (Tr. 17). Later, after determining Ms. Woodhull's severe and non-severe impairments, the ALJ stated that he "considered all of the claimant's medically determinable impairments, including these that are non-severe, in determining the claimant's residual functional capacity . . .," again citing SSR 96-8p. (Tr. 19).

Moreover, the ALJ discussed all the non-severe medically determinable impairments, and their functional limitations, at Step Two. In particular, the ALJ found that Ms. Woodhull's hyperlipidemia "remains without any reported symptoms and has been continually medically managed by a prescription statin . . . ." (Tr. 19.) He similarly found that Ms. Woodhull's restless legs syndrome had been medically managed through prescription medication, such that it "has been without any currently reported symptoms" even at the consultative evaluation. (*Id.*) And he found that Ms. Woodhull's occasional head tremor had been medically managed—successfully enough that "not once" was the tremor observed by a medical professional after April 2022. (*Id.*)

With respect to fibromyalgia—the condition that is the focus of Ms. Woodhull's argument—the ALJ reasoned as follows at Step Two:

> [T]he claimant only presented to the disability examination with a complaint of fibromyalgia and pain ("hurts") "all over all of the time," yet still self-managing this by as-needed ibuprofen and still never having such diagnosis confirmed by a rheumatology or similar specialist . . . . That said, she stated that she can sit and stand without limitation and only experiences pain on walking long distances. The August 2022 physical examination was devoid of any palpable tenderness in any location of the body and showed intact joint and spinal ranges of motion globally and full 5/5 muscle strength throughout . . . . Primary care office notes over 2022–2023 fail to show a single presenting complaint about pain in any location of the body, let alone the allegedly constant all-over body pain that the claimant professed at the early 2024 hearing in this matter; and at best relate fibromyalgia as an artifact of past medical history and correlative "myalgia" serving as the justification for refilling ibuprofen and Flexeril medications, oftentimes by telephone and again without any specifically reported pain . . . . This strongly constitutes "material" medical evidence over the current period to find that fibromyalgia has no longer been a severe impairment since at least the filing date of this application—*i.e.*, that it causes no more than minimal limitation in the claimant's ability to do basic physical or other work activities.

(Tr. 19.)

While it may have been preferrable for the ALJ to address Ms. Woodhull's non-severe impairments again when discussing how he came to develop the RFC, I am convinced that the ALJ's analysis at Step Two complied with SSR 96-8p and *Emard*. He identified the non-severe impairments and discussed, with citations to the medical record, his finding that those impairments had been adequately controlled with medication such that they resulted in no more than minimal limitations in Ms. Woodhull's ability to perform work activities. Post-*Emard* decisions from this district have routinely affirmed the Commissioner in similar circumstances. *See, e.g.*, *Holt v. Comm'r of Soc. Sec.*, No. 1:23-CV-00209-BMB, 2023 WL 8770503, at *8 (N.D. Ohio Nov. 1, 2023) (affirming ALJ's decision despite failure to discuss non-severe impairments when formulating RFC where ALJ cited to SSR 96-8p, discussed the functional limitations stemming

from the claimant's non-severe impairments imposed at Step Two, and stated that ALJ considered non-severe impairments when formulating RFC), *report and recommendation adopted*, 2024 WL 83029 (N.D. Ohio Jan. 8, 2024); *Yost v. Comm'r of Soc. Sec.*, No. 1:23-CV-00699-JRA, 2024 WL 1054234, at *7–9 (N.D. Ohio Jan. 26, 2024) (same), *report and recommendation adopted*, 2024 WL 1051654 (N.D. Ohio Mar. 11, 2024); *Nelson v. Comm'r of Soc. Sec.*, No. 1:21-CV-01784-JG, 2023 WL 2435322, at *15–16 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 2431989 (N.D. Ohio Mar. 9, 2023).

Having found that the ALJ's analysis complied with SSR 98-6p, I turn finally to the question of whether the ALJ's conclusions were supported by substantial evidence. They were.

Ms. Woodhull offers no meaningful argument regarding weight of the evidence with respect to hyperlipidemia, restless legs syndrome, or occasional resting tremor. She does not direct the Court to medical records or opinion evidence establishing a functional limitation stemming from these conditions, nor does she assert what functional limitation she would have had the ALJ include in the RFC as a result of those conditions. "[A] diagnosis alone is not enough to establish specific functional limitations as a matter of right." *E.g.*, *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n. 7 (S.D. Ind. July 9, 2019); *see also* Social Security Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.")).

Her argument with respect to fibromyalgia, while more developed, also fails to convince me that the ALJ's decision was not supported by substantial evidence. She again does not identify

a specific functional limitation that she would have included in the RFC stemming from her fibromyalgia. *See Helwagen v. Comm'r of Soc. Sec.*, No. 5:22-CV-01467, 2023 WL 3727253, at *17 (N.D. Ohio Apr. 20, 2023) (finding substantial evidence where the claimant "presented no arguments in support of how or why the[] non-severe impairments should have altered the ALJ's RFC"), *report and recommendation adopted*, 2023 WL 3726575 (N.D. Ohio May 30, 2023).

Instead, Ms. Woodhull merely points to several medical records in which she complains of fatigue or generalized pain (*see, e.g.*, Tr. 352 ("easily fatigued," but in the context of anxiety), 416 ("pain in her entire body"), 639 ("fatigued and sleeping a lot")). She points out, correctly, that a person with fibromyalgia can have symptoms that "wax and wane," causing good days and bad days. *See* SSR 12-2p, 2012 WL 3104869, at *6 (July 25, 2012). And she argues that fibromyalgia would "at times" interfere with her ability to sustain full-time work. (Pl.'s Merits Br. at 10, ECF No. 9, PageID# 810.)

I find that Ms. Woodhull has not met her burden to show that her fibromyalgia results in a disabling functional limitation that the ALJ failed to consider. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Here, the ALJ acknowledged Ms. Woodhull's testimony and historical diagnosis of fibromyalgia but was convinced by routinely normal physical examination findings over a significant period, devoid of palpable tenderness and reflecting full range of motion and strength.

Ms. Woodhull directs the Court to *Bright v. Comm'r of Soc. Sec.*, No. 3:19-cv-2371, 2021 WL 1214823, at *3 (N.D. Ohio, Mar. 31, 2021), but that case does not meaningfully support her position. The court in that case expressed "concern" about the ALJ's analysis of the claimant's

fibromyalgia but reversed based on a different error and expressly made "no findings as to the ALJ's decision as to how [the claimant's] fibromyalgia [a]ffects her RFC." *Id.* As a result, there is not a significant discussion of the evidence relevant to the ALJ's consideration of fibromyalgia to compare to the ALJ's decision in Ms. Woodhull's case. To the extent there is information about that consideration, the case is readily distinguishable: the ALJ in *Bright* had found the claimant capable of medium-exertion work despite finding fibromyalgia as a severe impairment. *Id.* at *1, 3.

Any error at Step Two is harmless. The ALJ complied with SSR 96-8p when he analyzed the non-severe impairments at Step Two. And his conclusions were supported by substantial evidence. Accordingly, I recommend that the Court overrule Ms. Woodhull's first assignment of error.

### 2. *Second Assignment of Error—Consideration of the Prior RFC*

In her second assignment of error, Ms. Woodhull argues that the ALJ "erroneously adopted the prior ALJ's RFC." (Pl.'s Merits Br. at 13, ECF No. 9, PageID# 813.) She argues that the ALJ "failed to consider any of the new medical evidence" and relied too heavily on the prior ALJ's determinations, denying her the "fresh look" to which she was entitled. She directs the Court to medical records from appointments from 2022 through 2024 that reflect mood lability, tearfulness, panic, and anxiety, among other things. (*Id.* at 14–15, PageID# 814–15.)

The Commissioner defends the ALJ's decision, arguing that the decision reflects that the ALJ was mindful of the agency's past rulings but gave the evidence a fresh look. The Commissioner points out that the ALJ did not fully adopt the previous RFC because new and material evidence required different findings.

After careful consideration, I again agree with the Commissioner.

In *Drummond*, the Sixth Circuit held that principles of res judicata apply in the Social Security context, such that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997). Thus, "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id.*

In response to *Drummond*, the SSA promulgated Acquiescence Ruling 98-4(6), which provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

In *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit clarified *Drummond*'s scope. The court held that, while *Drummond* reached the correct result, it "overstat[ed]" its holding. *Id.* at 933. The court noted that principles of "[f]inality, efficiency, and the consistent treatment of like cases" are important in Social Security proceedings. *Id.* Accordingly, if an individual files a second application covering the same period as the initial application, res judicata applies unless the claimant provides a justification for revisiting the earlier decision. *Id.*

However, "a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." *Id.* And, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." *Id.* Thus, principles of res judicata "do not

36

prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.* at 931.

*Earley* emphasized that "[f]resh review is not blind review." *Id.* at 934. Thus, "[a] later administrative judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* However, by holding that res judicata does not apply to a new claim covering a new time period, *Earley* "significantly walked back administrative application" of *Drummond*. *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415, at *3 (N.D. Ohio Mar. 29, 2021).

Here, the ALJ stated that he "may be bound" to the RFC and other findings from the previous ALJ decision pursuant to *Drummond*. (Tr. 15.) However, the ALJ specifically cited to *Earley* and acknowledged that the Sixth Circuit had "discussed and clarified its previous holding in *Drummond*." (*See* Tr. 15, fn.1.) Thus, while the ALJ "remain[ed] bound . . . to apply the instructions within [AR 98-4(6)]," he also stated that the considered *Earley*'s holding. (*Id.*)

That citation and acknowledgement distinguish this case from cases like *Dilauro* (a case Ms. Woodhull relies upon). *Dilauro*, 2021 WL 1175415. There, the ALJ failed to cite *Earley*, stated the belief that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ," and then fully adopted the claimant's prior RFC, reasoning that "no new and material evidence exist[ed] to justify not adopting the residual functional capacity . . . ." *Id.* at *3. The court reversed, finding that these errors "permeated the entire adjudication." *Id.*; *see also Mykael Kline v. Comm'r of Soc. Sec.*, No. 3:23-CV-00754-JRK, 2024 WL 1380814, at *8 (N.D. Ohio Mar. 11, 2024), *report and recommendation adopted*, 2024 WL 1375901 (N.D. Ohio Apr. 1, 2024) (holding that *Earley* entitles claimant to review without

the presumption that a prior RFC remains correct); *Bowker v. Comm'r of Soc. Sec.*, No. 5:23-CV-00990-JDG, 2024 WL 733411, at *14 (N.D. Ohio Feb. 22, 2024); *Arendt v. Comm'r of Soc. Sec.*, No. 1:18-cv-00484, 2019 WL 1058263, at *10 (N.D. Ohio Mar. 6, 2019).

Here, while the ALJ cited *Drummond* and AR 98-4(6), that is not—by itself—grounds for remand. *See Hoffacker v. Comm'r of Soc. Sec.*, No. 1:23-cv-01010, 2024 WL 692690, at *8 (N.D. Ohio Feb. 20, 2024) ("remand might not be warranted simply because an ALJ cited *Drummond* in support [of] their findings or failed to cite *Earley*"). Rather, "[w]hen an ALJ makes an outdated reference to the *Drummond* standard, courts have focused on whether 'the ALJ properly applied the correct legal standards in a manner consistent with the Sixth Circuit's decision in *Earley*,' rather than the outdated citation itself." *Pollard v. Comm'r of Soc. Sec.*, No. 1:22-cv-00082, 2023 WL 4706763, at *6 (N.D. Ohio July 24, 2023) (citing *Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-CV-2015, 2020 WL 4366077, at *13 (N.D. Ohio July 30, 2020)).

Applying that focus here, I am convinced that the ALJ gave Ms. Woodhull's application the fresh look to which it was entitled. The ALJ provided a detailed account of Ms. Woodhull's medical records from her application date through the date of the new decision. (Tr. 17–38.) The ALJ repeatedly found that this evidence was new and material, such that significant findings from the prior decision were no longer appropriate. For instance, the ALJ did not adopt the previous decision's list of severe impairments, finding that Ms. Woodhull now suffers from severe impairments of schizoaffective disorder and obesity but no longer suffers from severe conditions of colitis and fibromyalgia. (Tr. 18.) He also found that new evidence supported a greater limitation than in the previous opinion in Ms. Woodhull's ability to understand, remember, and apply information. (Tr. 21 (rejecting a mild limitation in favor of a moderate limitation)). And, when crafting the RFC, the ALJ stated that he was "mostly adopt[ing]"—that is to say, partially

rejecting—the previous RFC after an "analysis of the current . . . evidence . . ." "with some comparison" to the prior decision. (Tr. 27.)

Ultimately, that analysis led the ALJ to conclude that the new evidence supported a lesser restriction with regard to workplace environment tolerances and no longer supported a limitation to superficial interactions with supervisors and coworkers. In coming to that conclusion, the ALJ cited (among other things) pulmonology and primary-care records from 2022 and 2023, radiological testing from 2022, mental-health records and psychological evaluations from 2022 through 2024, and testimony and evidence regarding Ms. Woodhull's recent travel and activities of daily living. (Tr. 25–35.) The ALJ found the state agency consultants' opinions to be persuasive, but only to the extent they were supported by a complete review of the medical evidence. Indeed, the ALJ specifically remarked upon the fact that the medical doctors had considered the October 2022 pulmonology visit and associated testing and their opinions remained consistent with the hearing-level evidence. (Tr. 36.)

As the *Earley* court observed, "[f]resh review is not blind review." *Earley*, 893 F.3d at 934. The ALJ here thoroughly considered new evidence when determining the RFC and ultimately found that Ms. Woodhull had different limitations than were found in the prior ALJ decision. The ALJ's conclusions did not violate *Earley* simply because his RFC was similar to a prior RFC. *See Hurst v. Comm'r of Soc. Sec.*, No. 5:23-CV-1722-JDA, 2024 WL 3890905, at *13 (N.D. Ohio Aug. 21, 2024); *Johnson v. Dudek*, No. 5:24-CV-1703-PAG, 2025 WL 1226638, *11 (Apr. 29, 2025), *report and recommendation adopted*, 2025 WL 1765444 (June 26, 2025).

Accordingly, I recommend that the Court overrule Ms. Woodhull's second assignment of error.

### 3.    Third Assignment of Error—Supportability and Consistency

In her third assignment of error, Ms. Woodhull contends that the ALJ erred in his analysis of Dr. Arnold's May 2022 functional assessment. She further argues that the ALJ failed to incorporate mental limitations opined by the state agency consultants. Taken together, Ms. Woodhull asserts that she has a marked limitation in her ability to interact with others and says that the RFC should have limited her to working alone in a job that does not require a fast pace or more than basic decision-making.

As an initial matter, the ALJ *did* limit Ms. Woodhull to work outside of a production-rate pace. (Tr. 25 ("but not at a production-rate pace, such as encountered in assembly-line work")). And he also limited her to simple work-related decisions. (*Id.* ("can make simple work-related decisions")). What remains is a consideration of whether Ms. Woodhull should have been limited to working alone.

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). A reviewing court must read the ALJ's decision as a whole. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section

40

404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, Ms. Woodhull correctly points out that Dr. Arnold summarized Ms. Woodhull's reported social interactions as follows:

> The claimant has very limited social interactions, mostly with her daughter on the phone. The claimant reported great difficulty with social interactions in the past, a history of not interacting well with customers, co-workers and supervisors and responding inadequately to workplace pressures by becoming enraged and acting out toward customers.

(Tr. 416.)

Ms. Woodhull also accurately points out that the state agency consultants determined that she is "capable of engaging in tasks that can be performed alone . . . ." (Tr. 91.) But she neglects to mention that the consultants went on to state that she remains capable of "brief, superficial interactions with coworkers and supervisors, and no interactions with the general public." (Tr. 92.)

In discussing Dr. Arnold's assessment, the ALJ said the following:

> Dr. Arnold's functional assessment is more a summary of her interview and mental status examination of the claimant than it is a "medical opinion" about functional limitations expected from schizoaffective disorder, PTSD, and bipolar disorder in the claimant's abilities to do mental work-related activities. However, to the extent that she did note some difficulties reported or clinically displayed in each area of mental functioning, her functional assessment is **generally persuasive** for suggesting some significant limitations because such would be supported by her cited problems endorsed by the claimant and the partial performance issues shown on testing attention/concentration, as well as noting affect was congruent with stated mood as sad, tearful, and angry; and because it is overall consistent with the collateral medical evidence in the record from the claimant's psychiatrist, which at times notes observed yelling and irritability. That said, in no way would I find persuasive an offered interpretation of the functional assessment as evidence for marked degree of limitations in any area of work-related mental functioning, as that would not be well supported by Dr. Arnold's other clinical observations (including cited intact mental flexibility by digit span registration and "strong" fund of knowledge, intact memory in all three respects, and overall unremarkable clinical presentation observed in interview) and would be disproportionate with the numerous points of medical evidence and the claimant's full extent of social activities and relationships discussed above.

(Tr. 37.)

The Commissioner defends the ALJ's reasoning by arguing that Dr. Arnold's opinion stated vague or broadly described difficulties—as opposed to concrete functional limitations—but that the ALJ nevertheless accounted for those difficulties in the RFC. The Commissioner points out that the RFC ultimately included "highly restrictive" social interaction limitations, limiting Ms. Woodhull to only occasional interactions with coworkers and supervisors and no interaction with the public. (*See* Tr. 25.)

I agree with the Commissioner that the ALJ adequately considered Dr. Arnold's opinion and accounted for the functional limitations contained therein. As an initial matter, the ALJ correctly characterized the assessment as primarily an interview summary. While Dr. Arnold documented that Ms. Woodhull has very limited social interactions and reported a history of not interacting well with others, the doctor did not state any opinion about a functional limitation stemming from those observations.

In translating that opinion into vocationally relevant terms, the ALJ reasonably concluded that the opinion was generally persuasive in suggesting some significant limitations. And in rejecting the position that the assessment could support marked limitations in mental functioning (beyond interacting with the public, which the ALJ had already found at Tr. 33), the ALJ addressed both supportability and consistency.

Specifically, the ALJ stated that a marked limitation would not be supported by Dr. Arnold's objective psychological findings on examination, which were relatively unremarkable. *See also Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021) (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with physician's treating notes), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020).

Next the ALJ stated that a marked limitation would not be consistent with other evidence in the record, which he had previously summarized. These included therapy appointments at which Ms. Woodhull described making plans with friends, had a close relationship with a friend at one point, had been staying with others at points in her life, was able to navigate multiple airports and

stay with family across country during a monthlong trip to Oregon, and had been attending in-office medical appointments. (Tr. 33–35.)

The ALJ summarized that "the longitudinal medical evidence from the claimant's psychiatrist, Dr. Arnold's one-time consultative examination, and this very recent initial visit in transferring psychiatric evaluation and medication management . . . contain objective signs, statements from the claimant about her symptoms and activities and improvement in symptoms from medications, and overall conservative and quite stable approach to treatment via the two medications . . . ." (Tr. 35.) This discussion, when read in connection with the ALJ's earlier thorough discussion of the medical and other evidence of record, adequately addressed consistency. *See Merrell*, 2021 WL 1222667 at *7 (holding that ALJ's decision to discount weight given to opinion from treating physician was supported by substantial evidence where opinion was inconsistent with other evidence in the record); *Creter v. Saul*, No. 1:20-cv-00840, 2021 WL 809323, at *11 (N.D. Ohio Mar. 3, 2021) (holding that ALJ did not err where ALJ specifically cited treatment records ALJ believed were inconsistent with treating physician's opinion and explained why).

Reading the ALJ's opinion as a whole and with common sense, he adequately explained how he considered Dr. Arnold's opinion, reasonably translated that opinion into functional limitations, and thoroughly set forth his reasoning for not accepting the opinion as supporting greater limitations.

44

Turning next to the state agency consultants, I begin again with the ALJ's discussion of those opinions:

> The State agency [consultants'] mostly shared administrative medical findings are only **partially persuasive** because their *de novo* finding of the claimant's mental residual functional capacity does not show any strong rationale apart from citing a new diagnosis, which is inconsistent with the policy guidance for applying the *Drummond* AR to a prior ALJ's findings. Moreover, Dr. Rivera's finding of the claimant needing a work setting in which she could work alone, while not inconsistent with the finding of no interaction with the public, conflicts with her other finding that the claimant retains the ability to have brief, superficial interactions with coworkers and supervisors. They did not adequately assess the claimant's alleged difficulties in memory abilities. Accordingly, I have found their findings persuasive only in respect to the one restricted mental work activity for interacting with the public, moderate degree of limitations in three of the four broad areas of mental functioning and in specific work-related mental abilities, and for reduced frequency (occasional instead of "brief") of interactions with coworkers and supervisors, lower pace demands of work tasks (no production-rate pace), and routine tasks and work setting (few changes). Conversely, I have found the claimant more limited than they assessed in memory and sustained concentration and persistence abilities— *i.e.*, simple, routine, and repetitive tasks and for making only simple work-related decisions—but have not found their undefined term "superficial," or the prior ALJ's defined term, as to quality of coworker and supervisor interactions to be well supported by the evidence they considered or to be consistent with the expanded record at the hearing stage of this claim, for reasons explained more thoroughly above but in general due to the claimant's full extent of relationships with her ex-husband and with friends and few instances of anger, irritability shown in the psychiatric progress notes and none in other medical reports.

(Tr. 38.)

The Commissioner defends this reasoning, arguing that the ALJ adequately explained why he was not adopting a limitation that Ms. Woodhull had to work alone.

I again agree that the ALJ adequately explained why did not adopt all of the consultants' opined limitations, addressing both supportability and consistency.

With respect to supportability, the ALJ pointed out that (1) the opinion seemed internally inconsistent, finding both that Ms. Woodhull needed to work alone but also was capable of brief,

superficial interactions with coworkers and supervisors, (2) was based on an inadequate review of the evidence, and (3) was based on an incomplete record, as the record was expanded at the hearing level.

With respect to consistency, the ALJ referred to his previous analysis, which is permitted, and emphasized Ms. Woodhull's relationships with friends and others and her ability to interact occasionally with others, with few documented instances of anger or irritability shown in the psychiatric progress notes.

The ALJ's reasoning here is readily distinguishable from the cases Ms. Woodhull cites. In *Kinney v. Comm'r of Soc. Sec.*, the ALJ had found a medical opinion persuasive, consistent, and supported—then failed to incorporate all the limitations in that opinion without explanation. *Kinney*, No. 23-3889, 2024 WL 2273365, at *3–4 (6th Cir. May 20, 2024). Here, the ALJ found these opinions only partially persuasive, accounting for all the limitations contained in those opinions and explaining why he had adopted most and rejected some. In *Russ v. Comm'r of Soc. Sec.*, the ALJ had completely neglected to discuss supportability with respect to one medical opinion and had inadequately discussed consistency with respect to multiple opinions. *Russ*, No. 1:20cv1838, 2021 WL 3709916, at *9 (N.D. Ohio Aug 20, 2021). Here, the ALJ addressed supportability and consistency with respect to each opinion and, reading his decision as a whole, the decision adequately sets forth the ALJ's reasoning to allow judicial review.

Having found that the ALJ complied with SSR 98-6p in addressing these medical opinions, I turn to a final consideration—whether the ALJ's conclusions about those opinions were supported by substantial evidence.

Here, Ms. Woodhull points to records documenting that she was observed to be irritable and yelling at her psychiatrist at two appointments. (*See* Tr. 716, 732.) She directs the Court to

records reflecting her mental health diagnoses. (*E.g.*, Tr. 397–400.) She points to the numerous records reflecting her complaints of panic, not being able to keep calm, tearfulness, mood swings, and other symptoms. (*See* Pl.'s Merits Br. at 17–18, ECF No. 9, PageID# 817–818.) And she notes that Dr. Arnold found her affect on examination to be consistent with an angry, sad, and fearful mood. (Tr. 414.)

This is merely a request to reweigh the evidence. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, the ALJ thoroughly discussed the evidence upon which Ms. Woodhull relies in this appeal. (*E.g.*, Tr. 29–33.) He considered her testimony and function reports. (*E.g.*, Tr. 25–26.) He then explained, with citations to the record, that Ms. Woodhull's impairments do not render her unable to interact occasionally with supervisors and coworkers. He cited instances where Ms. Woodhull reported having friends, spent nights sleeping at others' homes, shopped on a monthly basis, arranged transportation for herself and her husband, traveled to Oregon for a month, and navigated in-person medical appointments. (*E.g.*, Tr. 22.) He noted medical records reflecting cooperative behavior, friendly or pleasant presentations, relaxed demeanor, average eye contact, and other normal findings. (*E.g.*, Tr. 22–23.) He noted those records where medication was deemed to have improved her symptoms. (*E.g.*, Tr. 29–33.)

I am convinced that a reasonable mind might accept this evidence, and the other evidence

the ALJ cited in his decision, as adequate to support the conclusion that Ms. Woodhull is able to have occasional interaction with coworkers and supervisors in the work setting, contrary to the findings of the state agency consultants. *See Biestek v. Berryhill*, 587 U.S. 97, 102, 139 S.Ct. 1148, 203 L.Ed.2d 504 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

Before concluding, I briefly note that I have also considered and rejected Ms. Woodhull's argument—made in her reply brief—that the Commissioner's brief impermissibly set forth post hoc rationalizations for the ALJ's conclusions. This case readily distinguishable from *Revello v. Comm'r of Soc. Sec.*, the case Ms. Woodhull cites in support of her argument. *Revello*, No. 5:20-CV-1860, 2021 WL 6064784 (N.D. Ohio Dec. 22, 2021). In *Revello*, the court noted that the Commissioner did not cite any portion of the ALJ's substantive consideration of an issue "because there [wasn't] any." *Id.* at *6. Lacking substantive consideration in the decision itself, the court determined that it could not affirm based on the Commissioner's suggestion—made in briefing—of what the ALJ's reasoning might have been. *See id.* Here, in contrast, the Commissioner is asking the Court to affirm the ALJ's decision on the grounds noted in the decision.

Accordingly, I recommend that the Court overrule Ms. Woodhull's third assignment of error.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

  Dated:  February 9, 2026                              /s *Jennifer Dowdell Armstrong*
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge

48

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).